# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

SHONITA M. BLACK,
    Plaintiff,

vs.

HAMILTON COUNTY PUBLIC,
DEFENDER COMMISSION, et al.,
    Defendants.

Case No. 1:12-cv-503
Dlott, J.
Litkovitz, M.J.

**REPORT AND RECOMMENDATION**

Plaintiff Shonita Black brings this action alleging violations of her federal statutory and civil rights and various state law provisions in connection with the termination of her employment. This matter is before the Court on a motion to dismiss/motion for summary judgment filed by defendants Hamilton County Public Defender Commission (HCPD Commission), Hamilton County/Hamilton County Board of County Commissioners (BOCC), Kimberly Helfrich and Shelia Kyle-Reno (Doc. 97), plaintiff's response in opposition (Doc. 106), and defendants' reply in support of their motion. (Doc. 107). For the reasons set forth below, the Court recommends that summary judgment be granted in favor of defendants on all claims brought against them.

## I. Facts

Plaintiff filed the original complaint in this matter on July 2, 2012 (Doc. 1) and the first amended complaint on July 24, 2012. (Doc. 2). The amended complaint names as defendants "Hamilton County/Hamilton County Board of Commissioners/Hamilton County Public Defender Commission," Kimberly Helfrich individually and in her official capacity, and Shelia Kyle-Reno individually and in her official capacity.[1] Plaintiff brings claims under federal law for: (1)

---

[1] Defendants filed a Notice of Substitution of Party pursuant to Fed. R. Civ. P. 25(d) on August 21, 2012, substituting Hamilton County Public Defender Raymond T. Faller for Kyle-Reno in her official capacity. (Doc. 6).

interference with her rights under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*; (2) retaliation under the FMLA; (3) racial and gender harassment/creation of a hostile work environment under Title VII, 42 U.S.C. § 2000e, *et seq.*; (4) retaliation under Title VII; and (5) violation of her due process and other rights under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983. Plaintiff also brings state law claims for: (1) libel against defendant Helfrich; (2) negligent infliction of emotional distress; (3) intentional infliction of emotional distress; and (4) negligent retention and supervision. (*Id.*).

The following facts are undisputed[2]: Plaintiff is an African-American female who began her employment with the office of the Hamilton County Public Defender (HCPD) in August 2007 as an Attorney Guardian ad Litem in the Attorney Guardian ad Litem Division. (Doc. 84, Helfrich Depo. at 96; Doc. 106-1, ¶ 1). Plaintiff remained in the position of Attorney Guardian ad Litem until her termination in April 2011. (Doc. 97-1, Bailey Aff., Att. 2, Exh. A, Helfrich Aff., ¶ 4). Defendant Helfrich was the Director of the Guardian ad Litem Division throughout plaintiff's employment. (*Id.*, ¶ 1).

The Public Defender has the duty to assess indigency and establish staff to provide legal and administrative services that ensure effective representation in criminal and family law matters. (*Id.*, ¶ 3). The duty of a guardian ad litem to an alleged or adjudicated abused, neglected or dependent child is to "perform whatever functions are necessary to protect the best

---

[2] Defendants indicate that the Court should not consider plaintiff's responses to defendants' statement of Proposed Undisputed Facts (Doc. 97-1), which plaintiff has attached to her opposing memorandum. (Doc. 106-1). Defendants allege that the responses include misstatements, unsupported testimony, and hearsay. (Doc. 107 at 2, n.1). The Court will consider plaintiff's responses to the extent they are supported by materials in the record or plaintiff otherwise shows defendants' assertions of fact to be unsupported. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").

interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child." Ohio Rev. Code § 2151.281(I). If the guardian ad litem for an alleged or adjudicated abused, neglected or dependent child is an attorney admitted to practice law in Ohio, the guardian ad litem may also serve as counsel to the ward. Ohio Rev. Code § 2151.281(H). In her capacity as Attorney Guardian ad Litem, plaintiff served in both capacities. (Doc. 97-1, Bailey Aff., Att. 2, Exh. A, Helfrich Aff., ¶ 6). In cases in the Dependency Division of Juvenile Court, the following individuals would generally appear: (1) a social worker appointed by the Hamilton County Department of Jobs and Family Services (JFS); (2) an Assistant Prosecuting Attorney on behalf of the JFS social worker; (3) a Social Worker Guardian ad Litem in cases alleging dependency or neglect; (4) an Attorney Guardian ad Litem on behalf of the child in cases alleging abuse and on behalf of the social worker in cases alleging dependency or neglect; (5) parents; and (6) private counsel and/or a guardian ad litem to represent the parents. (Doc. 78, Kathryn Boller-Koch Depo. at 19-20). The function of both the Attorney Guardian ad Litem and Social Worker Guardian ad Litem is to advocate for the best interests of the child and to be that child's voice in court. (Doc. 84, Helfrich Depo. at 18-19).

Once a complaint alleging dependency, neglect or abuse is filed, an initial hearing known as a "Day 1 hearing" is scheduled before a magistrate. (Doc. 78, Boller-Koch Depo. at 23-24). If the parents do not appear at the hearing, a "Day 7 hearing" is set for one week out to allow notice to go out to the parents. (*Id*. at 26-27). An Attorney Guardian ad Litem is expected to attend every court hearing on each case to which she is assigned or to find someone to cover the

case, although it is occasionally appropriate for a Social Worker Guardian ad Litem to attend hearings without Attorney Guardian ad Litem representation. (Doc. 84, Helfrich Depo. at 50-51). The supervisor is responsible for ensuring coverage of the Attorney Guardian ad Litem's cases when the attorney is absent. (*Id*. at 38). The Attorney Guardian ad Litem is required to file two reports in connection with court hearings: (1) a disposition report, which is filed at the time of the disposition hearing, and (2) a review report, which is filed ten days in advance of a review hearing. (Doc. 78, Boller-Koch Depo. at 127-29).

As early as 2009, several magistrates relayed complaints to Helfrich about plaintiff's performance of her job duties as Attorney Guardian ad Litem. Magistrate Boller-Koch contacted Helfrich about concerns with plaintiff's tardiness for court appearances, her failure to timely file reports, and her unprofessional behavior. (Doc. 78-1, Exhs. 17, 27). In an email dated May 27, 2009, Magistrate Boller-Koch related a specific incident from that day and stated that plaintiff was "notoriously late for hearings" and displayed a "lack of decorum" once she was called to task for her dilatory behavior. (Doc. 78-1, Exh. 17). On December 10, 2009, Magistrate Boller-Koch sent an email to Helfrich complaining that plaintiff had failed to file a report on a case the prior day. (Doc. 78-1, Exh. 27).

Several other magistrates contacted Helfrich to complain about similar issues with plaintiff. Magistrate Charles Milazzo sent an email to Helfrich dated December 30, 2009, informing her that plaintiff was "routinely late for [his room]." (Doc. 78-1, Exh. 30). Prior to that date, Magistrate Milazzo had spoken directly to plaintiff about the issue and failing to achieve a resolution, had a follow-up conversation with Helfrich in an attempt to resolve the matter. (Doc. 81, Milazzo Depo. at 75-76, 78-79).

Magistrate Brenda Anthony also complained to Helfrich that plaintiff was missing

4

hearings that were scheduled before her. (Doc. 78-1, Exh. 15). In an email dated May 27, 2009, she also relayed that plaintiff had been dishonest about the reason for missing at least one hearing. (*Id.*, Exh. 15). In an email dated July 17, 2009, Magistrate Anthony wrote an email to Helfrich stating that she believed plaintiff had been "remiss in her duties" for failing to visit a child after the child was placed in a new foster home and for failing to file an updated guardian ad litem report. (*Id.*, Exh. 18).

Nathan Bell, Assistant Director of the Guardian ad Litem Division and plaintiff's intermediate supervisor (Doc. 97-1, Att. 2, Bailey Aff., Exh. 7, Nathan Bell Aff.), and Helfrich counseled plaintiff about her issues with tardiness in November 2009. (Doc. 84, Helfrich Depo. at 128-29). Prior to May 2010, Helfrich also had some discussions with plaintiff about certain incidents relayed by the magistrates. (Doc. 85, Pltf. Depo. at 462).

Helfrich issued plaintiff a "Record of Oral Warning" on May 13, 2010. (Doc. 78-1, Exh. 37). The warning stated that over the past several weeks, multiple complaints had been received regarding plaintiff's job performance and the supervisory staff in the Guardian ad Litem Division had "noticed deficits in [plaintiff's] performance." (*Id.*). Specifically, magistrates and other professionals had complained several times to Helfrich regarding plaintiff's timeliness for court hearings, which was an "on-going struggle" for plaintiff. (*Id.*). In addition, Helfrich had received several complaints concerning plaintiff's failure to file court reports in compliance with office requirements and Ohio Supreme Court Superintendence Rule 48. (*Id.*; *see* Ohio Sup. R. 48). Of particular note, Magistrate Milazzo had expressed concern in a recent case where plaintiff failed to file a report and then provided an excuse that the magistrate questioned and was unable to verify. (*Id.*). Further, plaintiff struggled to maintain her calendar. (*Id.*). Professional decorum in the courtroom was also noted to be an issue for plaintiff as she had a

tendency to become defensive when her position was questioned. (*Id.*). The other two categories of deficiencies noted were difficulty meeting basic responsibilities and failure to timely respond to phone calls and email communications. (*Id.*).

Magistrate Milazzo subsequently reported to Helfrich on June 1, 2010, that plaintiff had missed a hearing in his courtroom. (Doc. 81, Milazzo Depo. at 109). The magistrate informed Helfrich that he doubted the veracity of plaintiff's reason for missing the hearing because although she reported being outside the courtroom while the hearing was taking place, no one was present when the area outside the courtroom was checked at the time of the hearing. (*Id.* at 109-11).

Two weeks later, plaintiff provided a note from her physician dated June 15, 2010, which stated: "It is my medical opinion that Shonita Black is unable to work for medical reasons from June 21, 2010 to July 2, 2010." (Doc. 85-4, Exh. FF). Plaintiff was allowed sick leave for this time period. (Doc. 85-4, Exh. II). She was also granted an additional week of sick leave up to July 11, 2010. (*Id.*, Exh. JJ).

In August of 2010, plaintiff was denied a certificate of compliance for an annual three-hour training session in Columbus, Ohio, that plaintiff was required to complete under Ohio Sup. R. 48 in order to maintain eligibility to accept guardian ad litem appointments. (Doc. 84, Helfrich Depo. at 169-71). Plaintiff informed Helfrich that she was denied the certification because she arrived 30 minutes late for the training and was not present for the entire presentation. (*Id.* at 172). Alternative arrangements had to be made for plaintiff to meet the training requirement. (*Id.* at 173). On November 8, 2010, Helfrich observed plaintiff arrive 50 minutes late for a mandatory off-site educational training session that plaintiff was required to complete so as to continue to serve certain youth on her caseload. (*Id.* at 174-76).

6

Helfrich had a conversation with plaintiff on November 16, 2010, which Helfrich documented in a follow-up letter dated November 18, 2010. (Doc. 78-1, Exh. 58). The letter documented "several important issues" the two had discussed, including: (1) plaintiff's missing court hearings, which Helfrich warned would not be tolerated; (2) tardiness and the need to be timely for court hearings, training, and other events and to advise the appropriate individual if an emergency or other occurrence delayed her arrival; (3) plaintiff's excessive personal use of her office-issued cell phone; and (4) timely filing of motions with the court. (*Id.*). The letter advised plaintiff that there was an expectation that these issues would be addressed immediately and that future infractions would result in disciplinary action. (*Id.*).

That same date, plaintiff missed a 12:00 p.m. hearing in Magistrate Boller-Koch's courtroom and failed to file a report. (Doc. 78-1, Exh. 59). Magistrate Boller-Koch telephoned Helfrich to inform her she was "so frustrated" with plaintiff for "missing court hearings altogether and being late for court hearings" that she would no longer make any attempt to locate plaintiff if she was not present when hearings were set to begin and she would proceed without her. (*Id.*, Exhs. 58, 59; Doc. 78, Boller-Koch Depo. at 101-02).

On December 1, 2010, plaintiff received a three-day suspension for "[w]anton or willful neglect in the performance of assigned job duties." (Doc. 78-1, Exh. 64). Plaintiff was suspended "[a]s a result of [a] continued pattern of conduct," which was set forth as follows: First, on May 10, 2010, plaintiff received a Record of Oral Warning for neglect of court responsibilities, neglect of office responsibilities, and failure to respond timely to communication and correspondence. Second, on November 16, 2010, plaintiff and Helfrich had a conversation regarding a missed court hearing, tardiness, and an excessive phone bill, which was followed by a letter from Helfrich dated November 18, 2010, documenting the conversation. Third, on

7

November 18, 2010, Helfrich received a call from Magistrate Boller-Koch indicating plaintiff failed to appear or file a report for a hearing scheduled at noon on that date. (*Id.*).

Plaintiff thereafter failed to appear at a hearing on January 25, 2011, before Magistrate Murphy Presley, in which plaintiff was to represent Social Worker Guardian ad Litem Julia Russell. (Doc. 78-1, Exh. 69, Russell Aff.). Magistrate Murphy called Marie Creed, an administrative assistant in the Guardian ad Litem Division, regarding plaintiff's absence. (Doc. 78-1, Exh. 70, Creed Aff.). Creed unsuccessfully attempted to contact plaintiff on her cell phone and left a voicemail message for plaintiff to contact either Creed or Magistrate Murphy.[3] (*Id.*). After she was alerted to plaintiff's absence, Helfrich sent a text message to plaintiff asking if she could be present by 9:30 a.m. for the hearing. (Doc. 84, Helfrich Depo. at 55-56). Having received no answer, Helfrich covered the hearing, which lasted from 10:17 a.m. to 10:39 a.m. (*Id.* at 56, 58). Plaintiff sent Helfrich a text message at approximately 11:56 a.m. stating she had become ill that morning and required care for an emergency medical need for the next week. (*Id.* at 56). Plaintiff informed Helfrich she had tried to come speak with her but Helfrich was covering plaintiff's case at the time. (*Id.*). Plaintiff did not contact Helfrich or any other member of the supervisory staff before texting Helfrich at 11:56 a.m. (*Id.* at 55-56, 58; Doc. 78-1, Exh. 71).

The following day, Helfrich sent plaintiff an email updating her on a hearing Helfrich had covered for her at 8:30 a.m. (Doc. 84-1, Exh. 26). Helfrich also informed plaintiff that she would need a copy of any medical documentation from her hospital/emergency room visit the prior morning and documentation showing she required the week off for medical reasons. (*Id.*). Finally, Helfrich informed plaintiff that there were several procedural matters they would need to

---

[3] Plaintiff admits this statement but alleges in response to defendants' statement of Proposed Undisputed Facts that she contacted Magistrate Persley. (Doc. 106-1, ¶ 150, citing Doc. 78-1, Exh. 70, Creed Aff., Exh. 71, Helfrich Aff.).

discuss upon her return. (*Id.*).

Plaintiff submitted a note to Helfrich from her physician, Dr. Janson Becker, M.D., dated January 25, 2011, which provided the following reason for her absence from work: "Off work January 25 through January 31, 2011 due to medical condition. May return to work February 1, 2011." (Doc. 84-1, Exh. 23). According to Dr. Becker's medical files, plaintiff was not examined by Dr. Becker or any member of his staff on January 25, 2011. (Doc. 97-1, Att. 6, Aff. of Karen Rechel, Hamilton County Prosecutor's Office paralegal). Dr. Becker's records show only that plaintiff called his office at 10:58 a.m. and indicated to the staff that she thought she needed to take off work "for a while." (Doc. 85-5, Exh. OO). A staff member returned plaintiff's call at 11:16 a.m. and informed her that a note would be left at the front desk for her to pick up stating, "Off work Jan. 25 through 31, return Feb. 1, 2011." (*Id.*).

An employee of the office of the HCPD, Tom Rottinghaus, executed an affidavit in March 2011 in which he stated that he recalled observing plaintiff putting money in a parking meter in the vicinity of the office sometime between 8:45 a.m. and 9:15 a.m. on the morning of January 25, 2011. (Doc. 78-1, Exh. 72, Aff. of Tom Rottinghaus). Plaintiff disputes that Rottinghaus could have seen her at that time. (Doc. 85, Pltf. Depo. at 161-62). Plaintiff's co-workers, Scott Ball and Miranda Tavares, also executed affidavits in March 2011 in which they stated they were standing outside the building at 800 Broadway at approximately 10:45 a.m. on January 25, 2011, when they saw plaintiff exit the building. (Doc. 78-1, Exh. 73, Aff. of Scott Ball; Exh. 74, Aff. of Miranda Tavares). They stated that plaintiff did not appear ill and was walking at a normal pace without difficulty. (*Id.*). Plaintiff does not dispute that Ball and

---

Neither of these affidavits states or otherwise indicates that plaintiff contacted Magistrate Persley.

Tavares saw her at that time. (Doc. 85, Pltf. Depo. at 146-47).[4]

Plaintiff filed a race discrimination charge with the Equal Employment Opportunity Commission (EEOC) on January 31, 2011. (Doc. 88-1, Exh. 68). Plaintiff alleged she is black; she was discriminated against on the basis of her race when she was suspended on or about December 1, 2010, for a policy violation; and white employees who had committed the same policy violation were not disciplined. (Id.).

Prior to the filing of the EEOC charge, in November 2010, Helfrich had directed plaintiff to travel to Florida to fulfill a requirement that all guardians ad litem visit children on their caseloads every 90 days. (Doc. 84, Helfrich Depo. at 81, 87, 177). Plaintiff had visited the children in question, who were previously adjudicated dependent and abused due to allegations of domestic violence, in August 2010. (Doc. 97-1, Att. 4, Aff. of Magistrate Carla Guenther, ¶ 3; Doc. 85, Pltf. Depo. at 182). Plaintiff submitted two travel requests to travel to Florida to visit the children. She submitted the first request on December 30, 2010, for January 7 and 8, 2011. (Doc. 78-1, Exh. 81). However, Helfrich was on vacation when plaintiff submitted the request and she did not sign it in time for plaintiff to go on the requested dates. (Doc. 85, Pltf. Depo. at 187-88). Plaintiff submitted a second request for February 11 and 12, 2011, which Helfrich approved. (Doc. 78-1, Exh. 82). Plaintiff did not make the trip and did not communicate to

---

[4] Plaintiff alleges in her responses to defendants' statement of Proposed Undisputed Facts that "because of their dislike" for her, "Ball and Tavares made false affidavits." (Doc. 106-1, ¶ 157, citing Doc. 85, Pltf. Depo. at 146-47, 246-47)). This allegation is not supported by the deposition testimony cited by plaintiff. The deposition testimony plaintiff cites does not dispute any statement in the affidavits with the exception of whether Tavares said "Hi" to plaintiff when she exited the building. (Doc. 85, Pltf. Depo. at 146). Plaintiff also alleges that Magistrate Persley's case manager, Janice Shaw, saw plaintiff when she came to the courthouse to speak to Magistrate Persley and Helfrich regarding her illness and missing the hearing; Shaw stated that plaintiff was not angry but was "emotionally sad [and] crying"; and plaintiff requested that Shaw pray for her. (Doc. 106-1, citing Doc. 102, Shaw Depo. at 22-25; Doc. 85, Pltf. Depo. at 146-47, 246-47). This allegation is likewise not supported by the evidence plaintiff cites. Although Shaw recalled such an encounter in the copy room, she could not recall the date of the encounter. (Doc. 102, Shaw Depo. at 22-25). Shaw did *not* testify that she saw plaintiff when plaintiff was at the courthouse to speak with Magistrate Persley or Helfrich on January 25, 2011. (Id.).

Helfrich that she did not travel on those dates. (Doc. 84, Helfrich Depo. at 218-23; Doc. 78-1, Exh. 91). On March 2, 2011, Helfrich learned plaintiff was in Florida when Helfrich sought to determine her availability to assist with the Day 1 docket. (Doc. 78-1, Exh. 91; Doc. 84, Helfrich Depo. at 224-25). Plaintiff did not give Helfrich prior notice that she would be in Florida conducting a visit on that date. (Doc. 85, Pltf. Depo at 189-91, 197; Doc. 78-1, Exh. 91).

On April 6, 2011, administrative assistant Creed in the Guardian ad Litem Division received a call from a Hamilton County First District Court of Appeals staff member giving notice that plaintiff had failed to file a brief in a case that had been due on April 4, 2011. (Doc. 78-1, Exh. 91). When Creed attempted to reach plaintiff on her office cell phone, she received a voice mail informing callers that plaintiff was on an extended absence, which was not accurate. (Doc. 85, Pltf. Depo. at 213-14). On April 7, 2011, plaintiff received leave to file the brief *instanter*. (Doc. 78-1, Exhs. 93, 94, 97). However, the Court of Appeals *sua sponte* struck the brief that same date because neither the brief nor certificate of service included a signature. (*Id.*, Exh. 95). Plaintiff filed an amended brief that same date. (*Id.*, Exh. 96).

Plaintiff was subsequently terminated in April 2011. The reasons given for her termination were: (1) plaintiff missed a Court hearing on January 25, 2011, and failed to timely notify a supervisor or the Court of her absence; (2) plaintiff failed to timely follow defendant Helfrich's directive to conduct a home visit in Florida and subsequently traveled to Florida on March 2, 2011, for that purpose without Helfrich's knowledge; and (3) plaintiff failed to timely file a brief in the Court of Appeals. (*Id.*, Exh. 92).

Plaintiff filed a charge with the EEOC on October 12, 2011, for retaliation and race, sex, and disability discrimination. (Doc. 97-1, Ex. D). Plaintiff alleged she is a black female with a disability who was treated differently than males and non-disabled

11

employees, she had been discriminated against, and she had been retaliated against for filing an earlier discrimination charge. (*Id.*).

On October 26, 2011, the EEOC dismissed plaintiff's first EEOC charge alleging race discrimination which she had filed in January 2011 and issued a Notice of Right to Sue. (Doc. 97-1, Att. 2, Bailey Aff., Exh. E). On March 29, 2012, the EEOC dismissed the second charge and issued a Notice of Right to Sue. (*Id.*, Exh. F).

## II. Summary judgment standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. The court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). However, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return

a verdict for that party. *Id.* (citing *Cities Serv.*, 391 U.S. at 288-289). If the evidence is merely colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249-50.

To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd.  v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III. Plaintiff's claims against the BOCC

The BOCC contends that it must be dismissed as a party from this lawsuit because it cannot be held liable for the actions of the office of the HCPD and its employees. (Doc. 97 at 22-23). The BOCC alleges it has no statutory authority over the HCPD Commission.  (*Id.*, citing Ohio Rev. Code § 120.01, *et seq.*; Doc. 97, Att. 3, Aff. of Raymond Faller, Hamilton County Public Defender, ¶¶ 3, 9). The BOCC states that the HCPD has voluntarily chosen to adopt some of the policies of the BOCC, but the BOCC cannot require the HCPD to adopt its policies. (*Id.* at 22, citing Doc. 97, Att. 5, Aff. of Jack Herbert, HCPD Fiscal Officer, ¶¶ 3, 4). The BOCC further alleges that plaintiff has not produced any evidence showing that the BOCC had any involvement in her employment or the employment actions giving rise to this lawsuit. (*Id.* at 22-23).

Plaintiff alleges in response that Hamilton County is not *sui juris*, and therefore she must bring this lawsuit against the County Commissioners for violations of her rights. (Doc. 106 at 3, citing *Lowe v. Hamilton Cnty. Dep't of Job & Family Servs.*, No. 1:05cv117, 2008 WL 816669, at *2 (S.D. Ohio Mar. 26, 2008)). Plaintiff suggests the BOCC is subject to suit under the facts

13

of this case because the HCPD adopted policies and procedures generated by the BOCC (Doc. 84, Helfrich Depo. at 24); the HCPD relied on policies articulated by the BOCC when taking corrective action against plaintiff; and defendants "cite the BOCC handbook in every instance of discipline with the Plaintiff." (Doc. 106 at 3-5). Plaintiff also notes that in its position paper submitted in response to her EEOC charge, the office of the HCPD stated that "[a]ll employment actions taken by management and administrative staff of the HCDPO were in accordance with the Hamilton County Personnel Policy Manual on disciplinary procedures." (Doc. 78-1, Boller-Koch Depo., Exh. 42, Introductory para.). Plaintiff also alleges that she invoked compliance with procedural due process protections in accordance with the BOCC handbook after filing a discrimination charge with the EEOC in January 31, 2011, and before being requested to appear for her termination meeting on April 13, 2011. (Doc. 106 at 3, citing Doc. 4, Answer to amended complaint, ¶ 29; Doc. 85, Pltf. Depo. at 379).

Upon careful consideration of the parties' arguments and the undisputed facts, the Court finds that the BOCC is not a proper party defendant in this matter. The Ohio Revised Code governs the employment of employees of the office of the HCPD. Ohio Rev. Code § 120.01, *et seq*. Under the statutory scheme, the county public defender is appointed by a county public defender commission, which is vested with specified duties and responsibilities. Ohio Rev. Code §§ 120.14, 120.15. The county public defender in turn is vested with specified responsibilities under Ohio Rev. Code § 120.15, including the responsibility to "[a]ppoint assistant county public defenders and all other personnel necessary to the functioning of the public defender's office, subject to the authority of the county public defender commission to determine the size and qualifications of the staff" pursuant to § 120.14(B). The BOCC exercises some financial oversight of the county public defender's office. For instance, the county public defender

14

provides monthly reports to the BOCC certifying the indigency of individuals pursuant to Ohio Rev. Code § 120.15(D) and the BOCC sets the pay ranges for the county public defender and his or her staff. Ohio Rev. Code § 120.40. However, the county public defender is responsible for the day-to-day operations of the public defender's office. Ohio Rev. Code § 120.15.

There is no evidence in this case that the BOCC was involved in the HCPD's decisions and actions pertaining to plaintiff's employment with the office of the HCPD. The evidence shows that the HCPD, not the BOCC, disciplined plaintiff and made the decision to terminate her. Plaintiff has not produced any evidence that the BOCC was involved to any extent in decisions related to her employment and her ultimate termination. The fact that the office of the HCPD adopted policies and procedures of the BOCC and acted in accordance with those policies, standing alone, is not a sufficient basis for imposing liability on the BOCC for the actions of the HCPD. Because plaintiff has not come forward with evidence to create a genuine issue of material fact as to whether the BOCC had any involvement in the employment decisions at issue, the BOCC cannot be held liable to plaintiff on any of her claims in this matter. *See Burton v. Hamilton Cnty. Juvenile Court*, No. 1:04-cv-00368, 2006 WL 91600, at *4 (S.D. Ohio Jan. 11, 2006) (dismissal of BOCC appropriate in case involving Hamilton County Juvenile Court employee where BOCC was not vested with statutory authority over employment of juvenile court employees and there was no evidence showing the BOCC was responsible for or participated in the plaintiff's termination).[5]

---

[5] In a prior decision issued in this case denying the BOCC's motion to dismiss, the Court declined to follow *Burton* on the sole ground *Burton* was decided on summary judgment whereas this case was at the pleading stage; therefore, further development of the record was warranted before a determination was made as to whether the BOCC was properly named as a defendant in this lawsuit. *Black v. Hamilton Cnty. Pub. Defender Comm'n*, No. 1:12-cv-503, 2013 WL 684394, at *6 (Report and Recommendation) (S.D. Ohio Feb. 25, 2013) (Litkovitz, M.J.), *adopted*, 2013 WL 1155253 (S.D. Ohio Mar. 19, 2013) (Dlott, J.). That reasoning no longer applies as this case is now at the summary judgment stage.

## IV.  FMLA claims

Plaintiff brings claims under the FMLA for interference with her FMLA rights and retaliation for exercising her rights under the FMLA.  In support of the FMLA interference claim, plaintiff alleges that defendant Hamilton County qualifies as a "covered employer" under the FMLA; she notified defendants Helfrich and Hamilton County of "the desire to make use of FMLA for a serious medical condition"; and defendants interfered with her request.  (Doc. 2, ¶¶ 36, 37).  In support of the FMLA retaliation claim, plaintiff alleges that defendants Helfrich and Hamilton County "disciplined [her] for what would have been protected activity had they not interfered with [her] rights."  (*Id.*, ¶¶ 38, 39).

### A.  The FMLA

The FMLA enables employees covered by the Act to take up to 12 weeks of leave per year for the employee's own "serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  At the conclusion of the employee's leave period, she must be reinstated to her position or to an equivalent position in terms of "benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).

The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any

practice made unlawful by [the Act]." *Id.* at § 2615(a)(2). Consistent with the statute, the regulations provide that "[e]mployers may not discriminate against employees on FMLA leave in the administration of their paid leave policies." 29 C.F.R. § 825.207(a). Employers who violate the FMLA are liable to the employee for damages and such equitable relief as may be appropriate. 29 U.S.C. § 2617(a)(1).

The Sixth Circuit has recognized "two discrete theories of recovery" under the FMLA: (1) the "interference" theory arising under 29 U.S.C. § 2615(a)(1), and (2) the "retaliation" or "discrimination" theory arising under § 2615(a)(2). *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012) (citations omitted). Under the interference theory of liability, "'[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred,' regardless of the intent of the employer." *Id.* (citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)). A violation occurs under the interference theory when an employee is not restored to the same or equivalent position upon her return. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citing 29 U.S.C. § 2614(a)(1); *Arban*, 345 F.3d at 400). A violation occurs under the retaliation theory when "the employer took the adverse action because of a prohibited reason" as opposed to for a legitimate nondiscriminatory reason. *Seeger*, 681 F.3d at 282 (citing *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citation and internal quotation marks omitted)). An employer is prohibited from discriminating against an employee who has used FMLA leave and cannot use the taking of FMLA leave as a negative factor in employment actions. *Arban*, 345 F.3d at 403 (citing 29 C.F.R. § 825.220(c)). This prohibition extends to retaliatory discharge of an employee for taking FMLA leave. *Id.* (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)).

**B.  FMLA claims against defendant Helfrich in her individual capacity**

Defendants argue that plaintiff's FMLA claims against defendant Helfrich in her

individual capacity must be dismissed because the FMLA does not impose individual liability on

public agency employers.  (Doc. 97 at 25, citing *Mitchell v. Chapman*, 343 F.3d 811, 832 (6th

Cir. 2003)).  In *Mitchell*, the Sixth Circuit dismissed the claims brought against the defendant

federal agency supervisors in their individual capacity on the ground "the FMLA's individual

liability provision does not extend to public agencies."  *Mitchell*, 343 F.3d at 832, 833.  Plaintiff

does not dispute that the FMLA claims against Helfrich must be dismissed on this ground.  (Doc.

106).  Therefore, defendant Helfrich is entitled to summary judgment on the FMLA claims

brought against her in her individual capacity.

**C.  FMLA retaliation claim against defendants Hamilton County and Helfrich in her official capacity.**

Plaintiff relies on circumstantial evidence in support of her FMLA retaliation claim.

In FMLA retaliation cases that rely on indirect evidence, the Court applies the three-step

framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Seeger*, 681

F.3d at 283.  A plaintiff may establish a prima facie case of retaliation under the FMLA by

showing that "(1) [s]he was engaged in a statutorily protected activity; (2) [defendant] knew that

[s]he was exercising [her] FMLA rights; (3) [s]he suffered an adverse employment action; and

(4) a causal connection existed between the protected FMLA activity and the adverse

employment action.  *Id.* (citing *Donald v. Sybra, Inc.,* 667 F.3d 757, 761 (6th Cir. 2012)).  The

plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that

there is a causal connection between the retaliatory action and the protected activity.  *Id.* (citing

*Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)).  In order to establish a causal link, the

plaintiff must present evidence "sufficient to raise the inference that her protected activity was

18

the likely reason for the adverse action." *Zanders v. National R.R. Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir. 1990) (quoting *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir. 1982)).

If plaintiff makes a prima facie showing, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Seeger,* 681 F.3d at 284 (citing *Bryson,* 498 F.3d at 570). If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful retaliation. *Bryson,* 498 F.3d at 570 (citing *Macy,* 484 F.3d at 364). At the pretext stage, the Court considers whether the plaintiff has adduced evidence which would enable the factfinder to conclude that the employer's stated reason for terminating her "is not the true reason and is simply a pretext for unlawful retaliation." *Id.* at 572. A plaintiff may show pretext by demonstrating that the proffered reason (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action. *Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 349 (6th Cir. 2013) (citations omitted). "[T]he employer's motive is an integral part of the analysis" in an FMLA retaliation claim. *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 432-33 (6th Cir. 2014) (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 506 (6th Cir. 2006)).

Where the plaintiff alleges there was no basis in fact for the adverse employment action, she cannot establish pretext simply because the reason for her discharge was ultimately shown to be incorrect "as long as an employer has an honest belief in its proffered non-discriminatory reason[.]" *Tillman*, 545 F. App'x at 349 (quoting *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir. 2001); *Smith v. Chrysler Corp.,* 155 F.3d 799, 806 (6th Cir. 1998)). To determine whether the defendant had an "honest belief" in the proffered basis for the employee's discharge, the Court examines whether the defendant has established "'reasonable

reliance' on the particularized facts that were before it at the time the decision was made." *Id.* (quoting *Abdulnour v. Campbell Soup Supply Co.,* 502 F.3d 496, 502-03 (6th Cir. 2007); *Braithwaite v. Timken Co.,* 258 F.3d 488, 494 (6th Cir. 2001)).

The law in the Sixth Circuit holds that proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection. *Bryson,* 498 F.3d at 571 (evidence of a causal connection found where the plaintiff was discharged three months after he requested FMLA leave and on the day he was scheduled to return to work) (citing *Skrjanc,* 272 F.3d at 314; *Chandler v. Specialty Tires of Am.,* 283 F.3d 818, 826 (6th Cir. 2002) (stating that in the FMLA context, "[p]roximity in time can raise a prima facie case of retaliatory discharge")). *See also Bell v. Prefix, Inc.*, 321 F. App'x 423, 426-27 (6th Cir. 2009) ("the close temporal proximity between [the plaintiff's] leave and his termination in this case suffices for the showing of causal connection necessary at this stage of the inquiry") (citing *Skrjanc,* 272 F.3d at 314). However, "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Donald*, 667 F.3d at 763 (citing *Skrjanc,* 272 F.3d at 317). Nonetheless, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Bell*, 321 F. App'x at 431 (quoting *DeBoer v. Musashi Auto Parts, Inc.,* 124 F. App'x 387, 393-94 (6th Cir. 2005)).

Plaintiff has not come forward with competent evidence to create a genuine issue of material fact on her prima facie case of retaliation under the FMLA. Defendants do not dispute that the first three prongs of a prima facie case of FMLA retaliation are established: (1) plaintiff engaged in protected activity by using and requesting FMLA leave; (2) defendants were aware of plaintiff's use of FMLA leave and her FMLA leave requests; and (3) defendants subjected

20

plaintiff to an adverse employment action by suspending her and ultimately terminating her. *See Demyanovich*, 747 F.3d at 432-33. Defendants argue that plaintiff has not produced sufficient evidence to establish a causal connection between her protected activity and the adverse employment action so as to establish the fourth prong of her prima facie case. (Doc. 97 at 28). Construing all disputed facts and drawing all reasonable inferences in plaintiff's favor, the Court finds plaintiff has not come forward with any evidence of a causal connection between activity protected under the FMLA and an adverse employment action so as to establish the fourth element of a prima facie case of FMLA retaliation.

To establish a causal connection, plaintiff seeks to rely on the temporal proximity between the filing of her initial charge of discrimination with the EEOC on January 31, 2011 (Doc. 88-1, Exh. 68) and her termination on April 13, 2011. (Doc. 106 at 8-9). The EEOC charge alleged only *race* discrimination and included no allegations related to a medical condition or medical leave.[6] (*Id.*). Plaintiff must show a causal connection between "*protected FMLA activity* and the adverse employment action" to establish a prima facie case of FMLA retaliation. *See Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (emphasis added) (citing *Arban*, 345 F.3d at 404). *See also Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 557 (6th Cir. 2010) (retaliation claim failed because the plaintiff did not avail himself of a protected right *under the FMLA*). Temporal proximity between the filing of a *race* discrimination charge and an adverse employment action is not competent evidence of FMLA retaliation.

---

[6] The charge reads in full: "I. I am Black. On or about December 1, 2010, I was suspended for a policy violation. I am aware of White employees that have committed the same policy violation but not [sic] disciplined. II. Management claims I was lucky I was not terminated. III. I believe I was discriminated against because of my race in violation of Title VII of the Civil Rights Act of 1964, as amended." (Doc. 88-1, Exh. 68).

In addition to temporal proximity, plaintiff attempts to demonstrate a causal connection between the filing of her EEOC charge and her termination by alleging that defendants subjected her to the following adverse employment actions: "inconsistent application of standards; increased scrutiny; [] assertions that had no basis in fact; and wait[ing] for matters to 'fortuitously materialize' over a period of ten weeks before letting Plaintiff know that she was violating company policy" as evidenced by defendants' response to the EEOC charge. (Doc. 106 at 9, citing Doc. 78-1, Exh. 42). These generalized allegations are insufficient to establish a causal connection between protected activity *under the FMLA* and plaintiff's termination. First and foremost, plaintiff has failed to produce evidence to show that she was subjected to inconsistent standards, increased scrutiny, or unsupported factual assertions. Second, plaintiff has failed to draw a connection between these allegations and any FMLA-related activity. Plaintiff's unsupported allegations are insufficient to carry her burden to establish a genuine issue on the causation element of her FMLA retaliation claim. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't,* 115 F. App'x 806, 811 (6th Cir. 2004). *See also* Fed. R. Civ. P. 56(c)(1)(A) (a party must cite specific portions of the record to show a matter is genuinely disputed); *Cacevic v. City of Hazel Park*, 226 F.3d 483, 492 (6th Cir. 2000) (the Court is not obligated to "comb through the record to ascertain whether a genuine issue of material fact exists") (citing *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 407, 410 (6th Cir. 1992)); *Abdulsalaam v. Franklin County Bd. of Com'rs,* 637 F. Supp.2d 561, 576 (S.D. Ohio 2009) ("Put simply, it is not the duty of this Court on summary judgment to scour the record in an attempt to locate evidence to support Plaintiff's claims.") (citing *Williamson v. Aetna Life Ins. Co.,* 481 F.3d 369, 379 (6th Cir. 2007)).

Plaintiff's arguments related to defendants' response to her January 2011 EEOC race discrimination charge are difficult to follow. (Doc. 106 at 9). Plaintiff appears to rely on defendants' response as evidence that the reasons proffered by defendants for her termination are pretextual. (*Id.*, citing Doc. 78-1, Exh. 42). Plaintiff contends that defendants never met with her to discuss their concerns outlined in the response; plaintiff was unaware that certain incidents referenced in the response which postdated her suspension were problematic until she was served with the Recommendation and Notice of Termination in April 2011 (*Id.*, citing Doc. 78-1, Exhs. 91, 92); and defendants did not follow practices outlined in the handbook and did not speak to plaintiff as part of their ongoing investigation. (*Id.* at 9). However, plaintiff makes no attempt in her opposing memorandum to refute the majority of the alleged violations of office policy and procedure attributed to her in HCPD's response to the charge, including those incidents which defendants noted would be considered for future disciplinary action and which defendants have proffered as the legitimate reasons for her discharge. (Doc. 78-1, Exh. 92; Doc. 107 at 7, n.2, citing Doc. 106-1, ¶ 144). The reasons proffered by defendants are: (1) plaintiff missed a Court hearing on January 25, 2011, and failed to timely notify a supervisor or the Court of her absence; (2) plaintiff failed to timely follow defendant Helfrich's directive to conduct a home visit in Florida in November 2010 and subsequently traveled to Florida to conduct the visit on March 2, 2011, without Helfrich's knowledge; and (3) plaintiff failed to timely file a brief in the Hamilton County Court of Appeals. (Doc. 78-1, Exh. 92; Doc. 106-1, ¶ 144). Plaintiff cites only two pages of her deposition testimony as evidence to refute these proffered reasons. (Doc. 106-1, ¶ 144, citing Doc. 85, Pltf. Depo. at 190-91). This deposition testimony relates to plaintiff's travel to Florida on March 2, 2011, and references an email from that same date from plaintiff to Helfrich advising her that plaintiff was in Florida. (Doc. 85 at 190-91, citing Doc. 84-1, Exh.

31).  Neither plaintiff's deposition testimony nor the email refute defendants' evidence that plaintiff was terminated for failing to conduct a timely home visit to Florida and for traveling to Florida without Helfrich's prior knowledge.  Nor does this evidence address the missed January 2011 Court hearing and plaintiff's failure to timely file a brief in the Court of Appeals in April 2011.  In short, plaintiff's deposition testimony does not call into question the validity of defendants' proffered reasons for her termination.  Plaintiff's allegations, absent any evidentiary support, are insufficient to carry plaintiff's burden on summary judgment to show there is a genuine issue as to whether her termination was a pretext for FMLA retaliation.  *See* Fed. R. Civ. P. 56(c)(1)(A) (a party must cite to evidence in the record to show there is a genuine dispute on a matter); *Overstreet*, 115 F. App'x at 811 (plaintiff's unsupported allegations are insufficient to carry her burden to establish a genuine issue on summary judgment).

Finally, plaintiff has not identified personnel policies with which defendants purportedly failed to comply.  In any event, assuming plaintiff was entitled to notice of her infractions, the record shows that defendants gave plaintiff notice of ongoing performance deficiencies by issuing a Record of Oral Warning on May 13, 2010 (Doc. 78-1, Defts. Exh. 37; Doc. 84, Helfrich Depo. at 155-56); by issuing a three-day suspension on December 1, 2010, for "[w]anton or willful neglect in the performance of assigned job duties" pursuant to Ohio Rev. Code § 124.34 (Doc. 78-1, Exh. 64); and by counseling plaintiff for poor performance in May and November 2010 (Doc. 85, Pltf. Depo. at 113- Helfrich and Bell first spoke to plaintiff in May 2010 about her recurring problem with arriving to court on time; Doc. 78-1, Exh. 58 - Helfrich spoke with plaintiff about a number of recurring performance issues which Helfrich documented in a follow-up letter dated November 18, 2010).

In addition to the above allegations, plaintiff makes two allegations in connection with her FMLA interference claim that are appropriately characterized as claims for FMLA retaliation.  Plaintiff alleges that defendants interfered with her rights under the FMLA by (1) suspending her for "[t]aking leave in December 2010 for what would have qualified as a FMLA protected condition (Doc. 2, ¶ 20)"; and (2) terminating her "for taking emergency leave for what would have qualified as a FMLA protected condition (Doc. 2, ¶ 21)." (Doc. 106 at 5).  Plaintiff has not developed these arguments in her memorandum in opposition to the motion for summary judgment or produced any evidence to show she was suspended for exercising her FMLA rights in December 2010 or for taking emergency leave (presumably in January 2011).  Plaintiff has not presented evidence that she took any type of leave in December 2010.  Moreover, plaintiff has not introduced evidence to show there was a causal connection between her decision to take leave in December 2010 and her suspension on December 1, 2010, or her emergency leave on an unspecified date and her termination.  Nor has plaintiff presented any evidence to show that her suspension or termination was a pretext for FMLA retaliation.  It is not the Court's role to speculate as to the meaning of plaintiff's vague references and develop her barebones arguments, which are unsupported by any citations to the record. *See Cacevic*, 226 F.3d at 492 (the Court is not obligated to "comb through the record to ascertain whether a genuine issue of material fact exists.") (citing *Guarino,* 980 F.2d at 407, 410).  *See also* Fed. R. Civ. P. 56(c)(1)(A) (a party asserting that a fact is genuinely disputed must support that assertion with citations to the record).

For these reasons, plaintiff has not come forward with sufficient evidence to create a genuine issue of material fact on her FMLA retaliation claim.  Plaintiff has not produced evidence that shows there was a causal connection between activity protected under the FMLA

and an adverse employment action.  Nor has plaintiff pointed to evidence that would permit a reasonable fact-finder to conclude that the legitimate non-retaliatory reasons defendants have articulated for her termination are a pretext for FMLA retaliation.  Summary judgment should be granted in favor of defendants on plaintiff's FMLA retaliation claim.

### D. The FMLA interference claim against defendants Hamilton County and Helfrich in her official capacity.

Plaintiff argues that defendants interfered with her FMLA rights in violation of 29 U.S.C. § 2615(a)(1), which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any right granted under the statute.  The basis for plaintiff's interference claim as alleged in the amended complaint is not entirely clear.  Plaintiff alleges that in June and July of 2010, she was not able to work because of her own "serious health condition." (Doc. 2, ¶ 13).  On an unspecified date, plaintiff informed Helfrich that she would "need weeks off of work due to an FMLA protected condition." (*Id.*, ¶ 14).  Plaintiff twice requested a medical certification from Helfrich for her physician to complete, but Helfrich did not provide a certification to plaintiff. (*Id.*, ¶¶ 15-16).  Helfrich instead directed plaintiff to get a note from her physician for the required time off. (*Id.*, ¶ 17).  Plaintiff's physician "provided a note in advance that indicated [p]laintiff needed an extended period off of work due to a serious medical condition." (*Id.*, ¶ 18).  Defendant Helfrich required plaintiff to cover hearings "during the medical leave" but "certified time sheets to reflect [p]laintiff was out on medical leave for the three week period requested by [p]laintiff's physician." (*Id.*, ¶ 19).

Defendants interpret plaintiff's allegations in conjunction with her deposition testimony to mean they purportedly interfered with plaintiff's request to take FMLA leave by: (1) forcing plaintiff to delay by several hours the beginning of sick leave she requested and was granted beginning June 21, 2010 and extending into July because she could not find coverage for a

hearing she was assigned to cover at the beginning of the scheduled leave; and (2) refusing to provide plaintiff with an FMLA medical certification form for her physician to complete for the June-July sick leave period. (Doc. 97 at 25). Defendants contend that plaintiff voluntarily chose to cover the hearing on June 21, 2010, rather than find coverage or ask for a continuance, and Helfrich instructed plaintiff to go home when she saw her after the hearing. (Doc. 97 at 26, citing Doc. 85, Pltf. Depo. at 101, 108-09; Doc. 85-4, Defts. Exh. LL). Defendants also point to evidence showing that plaintiff's self-reported timesheet for June 21, 2010, reflects that plaintiff worked and was paid for 10 hours of work on that date, eight of which plaintiff worked voluntarily from home. (*Id.*, citing Doc. 85-4, Defts. Exh. HH; Doc. 85, Pltf. Depo. at 104). Finally, defendants contend that plaintiff has not shown that Helfrich was incorrect in advising her that she need only submit a note, rather than a medical certification, from her physician confirming that medical leave was necessary, and neither has plaintiff demonstrated that any harm resulted from defendants' failure to require a medical certification. (Doc. 97 at 27).

In response, plaintiff indicates that defendants have misconstrued her FMLA interference claim and asserts that she is alleging the following violations of her rights under the FMLA: (1) Helfrich "advis[ed] her to cover hearings where she could not secure coverage prior to taking leave (Doc. 2, ¶ 19)"; (2) "Taking leave in December 2010 for what would have qualified as a FMLA protected condition (Doc. 2, ¶ 20)"; and (3) "Terminating Plaintiff for taking emergency leave for what would have qualified as a FMLA protected condition (Doc. 2, ¶ 21)."[7] (Doc. 106 at 5). Plaintiff alleges that defendants admit she was not supplied with a medical certification for her physician to complete as she requested, and Helfrich led her to understand FMLA leave was not available in the office of the HCPD. (*Id.*, citing Doc. 85, Pltf. Depo. at 124). Plaintiff further

---

[7] The Court has addressed plaintiff's second and third allegations in connection with her FMLA retaliation claim.

alleges that Helfrich testified at her deposition that she was not familiar with the FMLA and a medical certification, Helfrich admitted that plaintiff requested "FMLA paperwork," and she also "admited [sic] that she knew it was a violation of FMLA to work during a period when one is out on FMLA." (*Id.*, citing Doc. 84, Helfrich Depo. at 231, 233). Plaintiff argues that by requesting medical certification paperwork, plaintiff triggered the FMLA. (Doc. 106 at 6, citing *Krenzke v. Alexandria Motor Cars, Inc.*, 289 F. App'x 629 (4th Cir. 2008)). Plaintiff indicates defendants did not meet their burden to determine whether the medical condition for which she requested a medical certification form to be completed by her physician qualified for FMLA leave. (Doc. 106 at 6). Plaintiff also indicates that defendants did not satisfy their burden to ascertain whether an "issue passing out leaving the courthouse," which plaintiff experienced "upon returning from leave," was an intermittent or specific condition for which plaintiff was receiving medical treatment and any work restrictions imposed by the condition. (Doc. 106 at 6-7, citing Doc. 85, Pltf. Depo. at 126).

Plaintiff's interference claim as articulated in her opposing memorandum is difficult to follow. Plaintiff does not allege that she specifically requested FMLA leave or that she was not paid for the sick leave she was granted. Rather, the essence of the claim appears to be twofold. First, plaintiff gave defendants notice of a request for sick leave to begin June 21, 2010, which defendants should have construed as a request for FMLA leave because plaintiff asked Helfrich to provide a medical certification form for her physician to complete; Helfrich interfered with plaintiff's right to take FMLA leave on the requested dates by requiring plaintiff to cover hearings during her scheduled two-week medical leave. Second, by denying plaintiff's request for a medical certification form, Helfrich precluded the HCPD from ascertaining whether plaintiff was suffering from an intermittent or specific condition for which plaintiff was being

28

treated and whether the condition restricted plaintiff's ability to perform her work duties. (Doc. 106 at 6-7).

To establish a prima facie case of FMLA interference, plaintiff must show that: "(1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled." *Donald*, 667 F.3d at 761 (citing *Killian,* 454 F.3d at 556) (citing *Walton v. Ford Motor Co.,* 424 F.3d 481, 485 (6th Cir. 2005)). The Sixth Circuit has explained that "[i]f an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Id.* (citing *Wysong v. Dow Chem. Co.,* 503 F.3d 441, 447 (6th Cir. 2007)).

Whether the employee's notice of her intention to take leave is sufficient depends on whether the employee provides sufficient information for the employer to reasonably conclude that the leave is needed for a serious health condition. *Branham v. Gannett Satellite Info. Network, Inc.*, 619 F.3d 563, 572 (6th Cir. 2010); *Gipson*, 387 F. App'x at 555 ("The information that the employee convey[s] to the employer [must be] reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that render[s] him unable to perform his job.")). To invoke FMLA protection, the employee must request leave and give the employer notice that she is requesting such leave for a serious health condition that renders her unable to perform her duties. *Brenneman v. MedCentral Health Sys.,* 366 F.3d 412, 421 (6th Cir. 2004) (citing cases). Once the employee gives notice, the employer may request medical certification from a health care provider. 29 U.S.C. § 2613(a).

Plaintiff has failed to produce evidence or cite authority to show defendants interfered with her rights under the FMLA by declining to provide her with a medical certification form. Plaintiff frames this issue as whether her request for a medical certification form constituted sufficient notice to her employer of a request for FMLA leave. (Doc. 106 at 5-6). Plaintiff alleges that defendants "ha[ve] not met [their] burden" and "[e]ven though she was paid for the time that she worked, this is not sufficient for FMLA leave." (Doc. 106 at 6). Plaintiff's allegations in this regard are difficult to follow. Presumably plaintiff intends to argue that defendants did not meet their burden to determine whether plaintiff qualified for FMLA leave after she provided notice of an FMLA-qualifying condition, and an FMLA violation occurred even though she apparently was paid for the entire period of her leave in June and July 2010.

Plaintiff has failed to carry her burden to create a genuine issue of fact on her FMLA interference claim because she has not introduced evidence to show she was deprived of benefits to which she was entitled under the FMLA. Although there is evidence that Helfrich was unfamiliar with a medical certification and was not significantly familiar with FMLA requirements (Doc. 85, Pltf. Depo. at 124; Doc. 84, Helfrich Depo. at 231), plaintiff does not dispute that defendants granted her sick leave request after she gave verbal notice and submitted a written physician's note stating she would need to take leave beginning June 21, 2010. (Doc. 85-4, Exh. II). The record shows that defendants extended the leave period for an additional week. (*Id.*, Exh. JJ). Plaintiff has not cited any authority to show that an employer interferes with an employee's rights under the FMLA by providing paid sick leave in lieu of FMLA leave. In fact, employers are encouraged under the FMLA to adopt more generous policies than those provided under the Act. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 84 (2002); *Allen v. Butler Cnty. Com'rs.*, 331 F. App'x 389, 393 (6th Cir. 2009). Accordingly, there is no genuine

issue of fact as to whether defendants interfered with plaintiff's FMLA rights by declining her request for a medical certification form or by otherwise failing to comply with the notice provisions of the FMLA.

In addition, plaintiff has not produced evidence to create an issue as to whether defendants interfered with her rights under the FMLA by requiring her to cover hearings during her paid medical leave in June 2010. Plaintiff has not shown she was entitled to FMLA leave in lieu of paid sick leave, and she has not made any allegations supported by citations to the record to show she was denied any FMLA benefits to which she was entitled.

Plaintiff also suggests defendants did not carry their burden to determine whether the FMLA was implicated with regard to a health issue she experienced following her "return from leave." (Doc. 106 at 6-7, citing Doc. 85, Pltf. Depo. at 126). Plaintiff vaguely describes the condition as an "issue passing out leaving the courthouse." (*Id.*). Plaintiff testified at her deposition that on an unspecified date, she was "crossing the street and I passed out in the street going towards the Courthouse." (Doc. 85, Pltf. Depo. at 126). Plaintiff testified that she informed Helfrich and Bell that a co-worker had made an insensitive remark about the incident and that plaintiff's "cyst was acting up." (*Id.*). Plaintiff's complaint about a co-worker's insensitive remark and her vague comment about a medical problem "acting up" are not reasonably adequate to put her employer on notice that plaintiff was requesting leave for a "serious health condition" that rendered her unable to perform her job duties. *See Branham*, 619 F.3d at 572; *Gipson*, 387 F. App'x at 555; *Brenneman*, 366 F.3d at 421.

For these reasons, summary judgment should be granted in favor of defendants on plaintiff's claims for interference with her FMLA rights. Absent any facts or legal authority that create a genuine issue as to whether defendants denied plaintiff FMLA benefits to which she was

entitled, defendants are entitled to summary judgment on plaintiff's FMLA interference claim. *See* Fed. R. Civ. P. 56(c)(1)(A) (a party must cite particular portions of the record to show that a fact is genuinely disputed); *Overstreet*, 115 F. App'x at 811 (the non-moving party may not rely on mere allegations and assertions in her pleadings, but rather must present specific facts that show that there is some material issue warranting a trial).

## V. Plaintiff's racial and gender harassment/hostile work environment claims

Defendants move for summary judgment on plaintiff's claims that she was subjected to harassment and that defendants were responsible for the creation of a hostile work environment based on her race and gender. (Doc. 97 at 37-51; *see* Doc. 2, ¶¶ 40, 41). Defendants contend that defendants Kyle-Reno and Helfrich cannot be held liable in their individual capacities on plaintiff's Title VII claims; plaintiff failed to exhaust her administrative remedies as to her Title VII claims by failing to raise them in either EEOC charge she filed; and plaintiff has not produced evidence that shows she was subjected to a hostile work environment.

Discrimination that is "sufficiently 'severe or pervasive' to 'alter the conditions of [the victim's] employment and create an abusive working environment'" is actionable under Title VII. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986). To prevail on a hostile work environment claim based on gender or race harassment, plaintiff must establish that (1) she is a member of a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on her gender or race, (4) the harassment had the effect of unreasonably interfering with her work performance by creating a hostile, offensive, or intimidating work environment, and (5) the defendant knew or should have known about the harassment and failed to act. *Williams v. CSX Transp. Co., Inc.,* 643 F.3d 502, 511 (6th Cir. 2011). *See also Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999).

To satisfy the fourth prong, plaintiff must show that the conduct to which she was subjected was sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive, and that she subjectively regarded the conduct as abusive. *Smith v. Leggett Wire Co.,* 220 F.3d 752, 760 (6th Cir. 2000) (citing *Jackson v. Quanex Corp.,* 191 F.3d 647, 658-59 (6th Cir. 1999)). In determining whether a reasonable person would consider an environment hostile or abusive, the Court must consider all of the circumstances, including the frequency and severity of the conduct and whether the conduct is threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance. *Hafford,* 183 F.3d at 512. When analyzing the fourth element, the Court must consider harassment "by all perpetrators combined," rather than "divid[ing] and categoriz[ing] the reported incidents." *CSX Transp. Co., Inc.,* 643 F.3d at 511 (citing *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 562 (6th Cir. 1999)). However, only harassment based on the plaintiff's gender or race may be considered. *Id.* (citing *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 464 (6th Cir. 2000)). "Harassment is based on race [or gender] when it would not have occurred but for the plaintiff's race [or gender]; the harassing conduct need not be overtly racist [or of a sexual nature] to qualify." *CSX Transp. Co.,* 643 F.3d at 511 (citing *Clay v. United Parcel Serv., Inc.,* 501 F.3d 695, 706 (6th Cir. 2007)).

Employer liability for co-worker harassment is based directly on the employer's conduct. *Hafford,* 183 F.3d at 513 (citing *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 804 n.11 (6th Cir. 1994)). An employer is liable if it "knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action." *Id.* Employer liability for supervisor harassment is vicarious. *Id.* (citing *Pierce,* 40 F.3d at 803).

## A. Individual defendants' liability under Title VII

Under Title VII, an individual employee/supervisor may not be held personally liable unless he or she meets the definition of "employer" under 42 U.S.C. § 2000e(b). *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997). Plaintiff has not addressed the issue of the individual defendants' liability under Title VII in her opposing memorandum. (Doc. 106). Thus, there is no dispute that in accordance with well-settled law, the individual defendants in this case cannot be held personally liable for any violations of plaintiff's rights under Title VII. Accordingly, defendants Helfrich and Kyle-Reno are entitled to summary judgment on plaintiff's Title VII claims.

## B. Exhaustion of administrative remedies

Defendants argue that the Court does not have jurisdiction over plaintiff's harassment/hostile work environment claims because plaintiff did not exhaust her administrative remedies as to these claims. Defendants contend that although plaintiff filed two EEOC charges, she did not raise her harassment/hostile work environment claims before the EEOC. Defendants argue that plaintiff did not allege harassment or creation of a hostile work environment in either one of her EEOC charges, and these allegations cannot reasonably be expected to grow out of her EEOC charges alleging race, gender and disability discrimination and retaliation.

Exhaustion of administrative remedies is a precondition to filing a Title VII lawsuit. *Lockett v. Potter*, 259 F. App'x 784, 786 (6th Cir. 2008) (citing *McFarland v. Henderson*, 307 F.3d 402, 406 (6th Cir. 2002); *Benford v. Frank*, 943 F.2d 609, 612 (6th Cir. 1991)). As a general rule, a plaintiff must first file a timely charge with the EEOC before pursuing an employment discrimination action under Title VII. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359 (6th Cir. 2010). The EEOC charge must be "sufficiently precise to identify the parties, and

34

to describe generally the action or practices complained of." *Id. See also* 29 C.F.R. § 1601.12(b); *Williams,* 643 F.3d at 508. As such, Title VII plaintiffs cannot bring claims in a lawsuit that were not included in the EEOC charge. *Younis,* 610 F.3d 359 (citing *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47 (1974)). This general rule serves two purposes: (1) it gives the employer information concerning the conduct about which the employee complains, and (2) it affords the EEOC and the employer an opportunity to settle the dispute. *Id.* (citing *Alexander*, 415 U.S. at 44).

Because aggrieved employees acting on their own behalf, rather than attorneys, usually file charges with the EEOC, their pro se charges are construed liberally. *Id.* at 362. The Court may consider claims that are "reasonably related to or grow out of the factual allegations in the EEOC charge." *Id.* (citing *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 732 (6th Cir. 2006)). Pursuant to this rule, "whe[n] facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Id.* (quoting *Davis v. Sodexho, Cumberland Coll. Cafeteria,* 157 F.3d 460, 463 (6th Cir. 1998)).

The Court in *Younis* considered whether the plaintiff had sufficiently alleged a hostile work environment in his EEOC charge. Plaintiff had not specifically presented such a claim in the charge. *Id* Moreover, "he cited only discrete acts of alleged discrimination, limited to three or four isolated comments by his peers that occurred over a three-year period." *Id.* The Court found these allegations were not sufficient to satisfy the administrative exhaustion requirement with regard to the plaintiff's hostile work environment claim under Title VII. *Id.* The Court held that because a plaintiff must present evidence of harassment that "unreasonably interfer[es] with [his] work performance and creat[es] an objectively intimidating, hostile, or offensive work

35

environment" to establish a hostile work environment, "inclusion in an EEOC charge of a discrete act or acts, standing alone, is insufficient to establish a hostile-work-environment claim for purposes of exhaustion." *Id*. Such evidence will suffice only where "the allegations in the complaint can be reasonably inferred from the facts alleged in the charge." *Id*. (citation omitted).

Here, plaintiff filed two EEOC charges alleging discrimination. Plaintiff filed the first charge with the EEOC on January 31, 2011. (Doc. 88-1, Exh. 68). She checked the box on the EEOC charge form for race discrimination and made the following allegations:

> I. I am Black. On or about December 1, 2010, I was suspended for a policy violation. I am aware of White employees that have committed the same policy violation but not [sic] disciplined.
>
> II. Management claims I was lucky I was not terminated.
>
> III. I believe I was discriminated against because of my race in violation of Title VII of the Civil Rights Act of 1964, as amended.

On October 12, 2011, plaintiff filed a second EEOC charge. (Doc. 97-1, Ex. D). She checked the boxes on the EEOC charge form for retaliation and race, sex and disability discrimination and made the following allegations:

> I. I am a Black female with a disability. During my employment, I have been treated differently than males and non disabled employees. Early in 2011 I had filed a discrimination charge. On April 13, 2011, I was discharged.
>
> II. Management informed me that I had performance problems which I deny.
>
> III. I believe I was discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended and the Americans with Disabilities Act, as amended and in retaliation for filing [a] discrimination charge.

(*Id.*).

Liberally construed, the EEOC charges do not include allegations of harassment or creation of a hostile work environment. Plaintiff did not specifically allege in either EEOC charge that she was harassed at work for any reason or otherwise subjected to a hostile work

environment. Nor could a harassment/hostile environment claim reasonably be expected to grow out of plaintiff's EEOC charges alleging race, gender, and disability discrimination and retaliation. *See Younis*, 610 F.3d at 362. In the January 2011 EEOC charge, plaintiff relied on a single discrete incident - her December 2010 suspension - when alleging she had been subjected to disparate treatment based on her race. (Doc. 88-1, Exh. 68). In the October 2011 charge, plaintiff alleged she was treated differently than males and non-disabled employees throughout her employment and that she was terminated in retaliation for filing a discrimination charge. (Doc. 97-1, Exh. D). However, plaintiff provided no indication that she was harassed in the workplace or subjected to a hostile work environment. Thus, plaintiff's EEOC charges would not have prompted the EEOC to investigate claims of harassment or a hostile work environment, and neither were the charges sufficient to put defendants on notice of such claims. Plaintiff's harassment/hostile work environment claims therefore exceeds the scope of her EEOC discrimination and retaliation charges. Plaintiff failed to exhaust her administrative remedies as to her harassment/hostile work environment claims. Summary judgment should be granted in favor of defendants on this claim for failure to exhaust administrative remedies.

### C. Merits of the harassment/hostile work environment claims

Defendants contend that assuming, *arguendo*, plaintiff exhausted her administrative remedies as to her Title VII claims, plaintiff cannot establish a violation of Title VII based on race/gender harassment that rose to the level of a hostile work environment. (Doc. 97 at 38-51).

In the motion for summary judgment, defendants argue that plaintiff cannot meet her burden of showing that the incidents of alleged harassment set forth in the amended complaint were based on sex or race, that the alleged harassment was severe or pervasive, that the alleged harassment unreasonably interfered with her work performance, and that defendants knew or

should have known of the alleged harassment and unreasonably failed to take prompt and appropriate corrective action. (*Id.*).  Defendants address each of the incidents of alleged gender/race harassment set forth in the amended complaint, wherein plaintiff alleged that defendant Helfrich forced her "to endure a working environment that was plagued with racial/gender biases and harassment as exhibited in the following non-exhaustive list of infractions" (Doc. 2, ¶ 22):

1. Plaintiff informed Helfrich that during a pretrial where only attorneys were present, an attorney stated they were waiting on the attorney from the HCPD as plaintiff was "only a social worker."  Helfrich informed plaintiff that the mistake was understandable given that the attorney did not know who plaintiff was. (Doc. 2, ¶ 22(a)).

2. Plaintiff informed Helfrich that during a pretrial conference where only the attorneys were present, a Judge asked plaintiff if she was the mother on the case. When plaintiff replied that she was not, the Judge asked if she was the grandmother.  Helfrich informed plaintiff that the Judge had a sight problem and did not mean anything by his comments.  (*Id.*, ¶ 22(b)).

3. Plaintiff informed Helfrich that she was afraid and asked for assistance from the office because violent clients were coming to her home and posting personal information about her on the internet.  Helfrich replied that plaintiff had made the choice to move "down here" (the Pendleton Arts District neighborhood of Cincinnati) and it was "a personal problem."  (*Id.*, ¶ 22(c)).

4. Plaintiff informed Helfrich that a co-worker called her "skanky" and a "skank." Helfrich told plaintiff that the co-worker meant to call her "swanky" and failed to discipline the co-worker.  (*Id.*, ¶ 22(d)).

5. Helfrich assigned Nathan Bell as plaintiff's supervisor after plaintiff "launched a formal complaint against his significant other for calling Plaintiff 'skanky' and a 'skank.'"  (*Id.*, ¶ 22(e)).

6. A member of the management team told plaintiff she looked like a "little school girl" and asked if he could place her across his lap and spank her.  Helfrich "was non-responsive to this action."  (*Id.*, ¶ 22(f)).

7. A member of the management team called out plaintiff's name, formed his fingers in the shape of a "V", and moved his tongue at a rapid pace between the "V". Helfrich "was nonresponsive to this action."  (*Id.*, ¶ 22(g)).

8. Helfrich assigned plaintiff to a "very small desk area in the back corner of the office facing a wall which Plaintiff's colleagues ridiculed as 'time out'" and which plaintiff complained "caused bruising on her[.]" Helfrich responded that she could not do anything about the situation. (*Id.*, ¶ 22(i)).

9. Helfrich reassigned an employee's cases to eight different clients without informing plaintiff or the Office Case Manager to make plaintiff appear incompetent and unprepared before the Court. (*Id.*, ¶ 22(j)).

10. Helfrich organized a birthday celebration for each member of the staff but disregarded plaintiff's birthday "despite the separate celebrations of 3 other white colleagues in the same week," so as to embarass plaintiff. (*Id.*, ¶ 22(k)).

11. Helfrich failed to timely submit plaintiff's paperwork in an attempt to "sabotage her[.]" (*Id.*, ¶ 22(l)).

12. Helfrich "fabricated and embellished facts on several occasions to make Plaintiff appear as unprofessional." (*Id.*, ¶ 22(m)).

13. Helfrich reported to magistrates that plaintiff was supposed to be on cases for which plaintiff was not the attorney of record and as to which she had no knowledge of requests to make appearances. (*Id.*, ¶ 22(n)).

14. Helfrich discouraged plaintiff from talking to a magistrate after he made repeated attempts to contact plaintiff. Helfrich told plaintiff she would "only make matters worse" by talking to the magistrate and that he was attempting "to play social worker from the bench." (*Id.*, ¶ 22(o)).

15. Helfrich reported that plaintiff refused cases and was being insubordinate on cases where Helfrich took affirmative steps to remove plaintiff from the case and appoint other staff. (*Id.*, ¶ 22(p)).

16. Helfrich held plaintiff to different standards than her white counterparts and disciplined plaintiff "in violation of these arbitrary rules." (*Id.*, ¶ 22(q)).

17. Helfrich informed members of the office staff that plaintiff filed an EEOC charge against the HCPD "in an attempt to foster hostility among Plaintiff and her co-workers." (*Id.*, ¶ 22(r)).

Although plaintiff has recited "a litany of perceived slights and abuses," the vast majority of these allegations cannot be considered because there is no indication they were based on plaintiff's gender or race. *See Bowman*, 220 F.3d at 464. Of the numerous incidents alleged to have occurred over a period of years, only three have possible sexual overtones: (1) a co-worker

39

called her "skanky" and a "skank"; (2) a co-worker made a sexually suggestive gesture; and (3) a co-worker made a comment with sexual overtones on one occasion. The only specific incident with possible racial overtones is Helfrich's alleged disparate treatment of plaintiff and white co-workers with respect to birthday celebrations on one occasion. Plaintiff has not introduced evidence on summary judgment to show that these isolated incidents, considered together, constituted conduct that was severe or pervasive and created a hostile work environment. Nor has plaintiff introduced evidence to show that she was subjected to other instances of race or gender harassment. To the contrary, plaintiff relies solely on the following allegations in her opposing memorandum to show there is a genuine issue of material fact on her hostile environment claim:

> Plaintiff is an African-American woman. Plaintiff identified a series of unwelcomed racial and/or sex harassment. The most severe and pervasive of all of those enumerated was a fear of violent clients showing up to Plaintiff's home between the period of April 2010 and January 2011. Defendant Helfrich acknowledges that Plaintiff "brought several such alleged instances to her attention."

(Doc. 106 at 11). Plaintiff alleges that defendants did not take prompt and reasonable action with respect to complaints plaintiff made "regarding harassment by non-employees." (*Id.* at 12).

Plaintiff states:

> A reasonable jury could find that it constituted harassment when Defendants failed to assist Plaintiff over a period of 8 months of clients showing up to her home. A reasonable jury could also scrutinize the reasons provided by Defendant Helfrich for failing to remove Plaintiff from the cases where she was harassed. Dr. Kinard testified that the incidents relayed were traumatizing in nature.[8]

(*Id.*, citing Jacqueline Kinard, Ph.D., Depo., Doc. 104 at 147). Dr. Kinard testified that plaintiff was "very traumatized" by incidents that plaintiff had reported to her involving clients who were

---

[8] Plaintiff does not identify Dr. Kinard in her memorandum. (Doc. 106 at 12). Dr. Kinard testified at her deposition that she is a clinical psychologist who conducted a clinical interview of plaintiff and prepared a report. (Kinard Depo., Doc. 104 at 14, 97-98; *See* Doc. 104, Exh. JJJJ).

"beginning to stalk and harass her" during 2010, including the following: the father of one child was sitting on plaintiff's porch when she arrived home one day; one of the parents who "began stalking her had on one occasion frightened his wife and children when he discharged a firearm through the ceiling"; and clients had disclosed her name, telephone number and address online, shown up near her home, placed pictures of a naked baby on her door, and slashed the tires on her car. (*Id.* at 146-47).

Plaintiff's barebones allegations that Helfrich failed to help her deal with incidents of "clients showing up to her home" and to remove her from cases where she was experiencing harassment are insufficient to withstand defendants' motion for summary judgment on plaintiff's harassment/hostile environment claims. First, plaintiff makes no allegations and points to no evidence which even remotely suggests that any of the alleged acts of harassment by clients or their family members were based on plaintiff's race or gender. Second, plaintiff does not make any allegations or point to any evidence that indicates Helfrich did not assist plaintiff in dealing with these incidents because plaintiff is African-American or female. Finally, Helfrich testified at her deposition that she recalled plaintiff reported that her personal information had been posted on a blog, a man who was sitting on plaintiff's doorstep followed her to the office, and someone had put pictures of dead babies on her window. (Doc. 84, Helfrich Depo. at 99-102). Helfrich testified there was no departmental protocol for these types of situations and she advised plaintiff to call the police, which plaintiff did. (*Id.* at 102-04; Doc. 85, Pltf. Depo. at 238). Plaintiff testified that all of the incidents ended around January of 2011. (Doc. 85, Pltf. Depo. at 238). Helfrich testified that she did not remove plaintiff from any of her cases due to these incidents because Helfrich did not "believe it was in the best interest of the children" and to do so would place Helfrich in a situation of "saying that a case was too dangerous for Ms. Black but

not too dangerous for a coworker." (Doc. 84, Helfrich Depo. at 102). Plaintiff has not introduced any evidence to refute Helfrich's explanation and to show that Helfrich failed to take additional action because of plaintiff's race or gender. In fact, plaintiff agrees that if her cases had been reassigned to a different Attorney Guardian ad Litem, that individual may likewise have been subject to harassment from these third parties. (Doc. 85, Pltf. Depo. at 240).

For these reasons, plaintiff has not carried her burden to come forward with evidence to create a genuine issue of material fact on her harassment/hostile work environment claims. Plaintiff has not produced evidence to show that she was harassed by defendants, co-workers, or non-employees based on her race or gender. Nor has plaintiff pointed to any evidence in the record to show that her employer failed to act on complaints of non-employee or other harassment and thereby created a hostile work environment due to plaintiff's race or gender. It is not the Court's obligation on summary judgment "to scour the record in an attempt to locate evidence to support Plaintiff's claims." *Abdulsalaam*, 637 F. Supp.2d at 576. *See also Cacevic*, 226 F.3d at 492 (the Court is not obligated to "comb through the record to ascertain whether a genuine issue of material fact exists.") (citing *Guarino*, 980 F.2d at 407). Summary judgment should be granted in favor of all defendants on plaintiff's harassment/hostile work environment claims brought under Title VII.

## VI. Retaliation claims

Defendants move for summary judgment on plaintiff's retaliation claim under Title VII. (Doc. 97 at 51-52). To prove a claim of retaliation, plaintiff must show that she engaged in protected activity; her employer knew of that activity; she was subjected to an adverse employment action; and there was a causal connection between the protected activity and the adverse employment action. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009). If

plaintiff establishes a prima facie case of retaliation, the burden of production shifts to defendants to "articulate some legitimate, non-discriminatory reason" for their actions. *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 862 (6th Cir. 1997) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981)). If defendants satisfy their burden, plaintiff bears the burden of demonstrating that the proffered reason was pretextual. *Id.* (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)).

Defendants admit that plaintiff can establish the first three prongs of a prima facie case of retaliation. They dispute only whether plaintiff has come forward with sufficient evidence to establish a causal link between activity protected under Title VII and plaintiff's termination so as to satisfy the fourth prong. (*Id.* at 52). Defendants further allege that they have proffered a legitimate, nondiscriminatory reason for terminating plaintiff's employment in connection with her FMLA claim. (*Id.*). Defendants contend that for the same reasons cited in connection with the FMLA claim, plaintiff has not produced evidence of pretext. (*Id.*).

Plaintiff offers the following one-sentence rebuttal to defendants' motion for summary judgment on her claim for retaliation under Title VII: "Plaintiff restates the same burden shifting analysis as presented in the FMLA Retaliation cause of action." (Doc. 106 at 12). Yet, the evidence plaintiff presented in connection with her FMLA retaliation claim fails to create a genuine issue of fact as to whether defendants' proffered reasons for her termination were a pretext for discrimination. (*See supra* at pp. 23-24). Plaintiff's response falls far short of satisfying her burden to "come forward with evidence establishing a material issue of fact for resolution by the fact-finder" on her Title VII retaliation claim. *Anderson*, 477 U.S. at 252. Because plaintiff has failed to present "even mere arguments in support of" her Title VII

retaliation claim, summary judgment should be granted in favor of all defendants on plaintiff's claim. *Overstreet*, 115 F. App'x at 812.

## VII. Claim under 42 U.S.C. § 1983

Defendants move for summary judgment on plaintiff's claim under 42 U.S.C. § 1983 alleging that defendants, acting under color of law, deprived plaintiff of her rights as guaranteed by the Fourteenth Amendment to the United States Constitution, including the right to due process of law. (Doc. 97 at 52-55; *See* Doc. 2, ¶¶ 44, 45). Defendants allege that plaintiff cannot pursue her due process claim because she is collaterally estopped from litigating the issue of whether she had a property interest in her continued employment. (*Id.* at 53). Defendants allege that this issue was previously litigated in administrative proceedings before the State of Ohio State Personnel Board of Review (SPBR), an administrative agency charged by statute to hear termination appeals of employees in the classified civil service. (Doc. 97 at 53-54; *see* Ohio Rev. Code § 124.03(A)(1)).

Plaintiff does not dispute that collateral estoppel (or issue preclusion) applies to rulings made in administrative proceedings. In fact, plaintiff acknowledges that it has been held that issue preclusion applies to rulings made in administrative proceedings that are judicial in nature. (Doc. 106 at 13, citing *United States v. Internat'l Harvester Co.*, Nos. 3-85-365, 3-86-541, 1993 WL 1377510 (S.D. Ohio Mar. 31, 1993)). Plaintiff instead appears to allege that the issue raised here was not previously litigated because the administrative decision was based on affidavits which included disputed assertions. (*Id.*).

Pursuant to the doctrine of issue preclusion, once a court has decided an issue of fact or law necessary to its judgment, the same issue cannot be relitigated on a different cause of action between the same parties. *Duncan v. Peck*, 752 F.2d 1135, 1138 (6th Cir. 1985). The essential

requirements of issue preclusion are: (1) the precise issue must have been raised and actually litigated in the prior proceedings; (2) the determination of the issue must have been necessary to the outcome of the prior proceedings; (3) the prior proceedings must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding. *Cobbins v. Tenn. Dep't of Transp.,* 566 F.3d 582, 589-90 (6th Cir. 2009) (citing *N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n,* 821 F.2d 328, 330 (6th Cir. 1987)).

Plaintiff's due process claim raises the issue of whether she was wrongfully denied procedural due process protections in connection with the termination of her employment. To make out a procedural due process claim, plaintiff has the burden of showing that (1) she had a liberty or property interest protected by the due process clause; (2) she was deprived of this protected interest; and (3) the state did not afford her adequate procedural protections prior to depriving her of the property interest. *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (citing *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)). Property interests do not derive from the Constitution, but rather are created and defined by "existing rules or understandings that stem from independent sources such as state law. . . ." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

When a state statute provides that "classified civil service employees" may be dismissed only for cause, the statute creates a property interest in one's employment that is protected by the Fourteenth Amendment. *Id.* (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (interpreting Ohio Rev. Code § 124.11, "Unclassified and classified service")). Employees in the unclassified service serve at the pleasure of the appointing authority, they may

be dismissed from their employment without cause, and they are afforded none of the procedural safeguards afforded to individuals in the classified service. *Suso v. Ohio Dep't of Dev.*, 639 N.E.2d 117, 121 (Ohio App. 10th Dist. 1993) (citations omitted). The procedural rights to be afforded to a public employee with a property interest in continued employment include "a pretermination opportunity to respond, coupled with post-termination administrative procedures." *Silberstein*, 440 F.3d at 315.

Here, there is no dispute that plaintiff appealed her termination to the SPBR. The HCPD moved to dismiss the appeal on the ground the SPBR did not have jurisdiction over the appeal because plaintiff was an unclassified civil servant under Ohio law. (Doc. 97-1, Att. 2, Bailey Aff., Exh. A). Administrative Law Judge (ALJ) Jeannette E. Gunn issued a Report and Recommendation on September 21, 2012, in which she determined that the provisions of Ohio Rev. Code § 124.11(A)(28) "exempt[ed] [plaintiff's] position from the classified civil service." (*Id.*, Exh. B). The ALJ found that because plaintiff "occupied a position in the unclassified service at the time of her removal from employment, [the] Board lack[ed] jurisdiction to consider her appeal." (*Id.*). She therefore recommended that plaintiff's appeal be dismissed. (*Id.*). The SPBR upheld the ALJ's recommendation on reconsideration and ordered that the appeal be dismissed for lack of jurisdiction pursuant to Ohio Rev. Code § 124.11(A)(28). (*Id.*, Exh. C). The order of the SPBR was appealable to the Court of Common Pleas pursuant to the provisions of the Ohio Revised Code. (*Id.*). However, plaintiff chose not to file an appeal. (Doc. 85, Pltf. Depo. at 558-60).

Thus, the record shows that the essential elements of issue preclusion have been satisfied with respect to the issue of whether plaintiff was a classified employee under Ohio law. The issue was raised and litigated when plaintiff appealed her termination to the SPBR. Further, the

resolution of that issue was necessary to the outcome of the SPBR proceedings because the SPBR determined it did not have jurisdiction to consider plaintiff's appeal of her termination based on her status as an employee in the "unclassified service." (Doc. 97-1, Att. 2, Bailey Aff., Exhs. B, C).  In addition, the SPBR's decision resulted in a final judgment on the merits of plaintiff's appeal.  Finally, plaintiff had a full and fair opportunity to litigate the issue of whether she was a classified employee in the SPBR proceedings and to appeal the SPBR's decision, but she chose to forego an appeal.  The SPBR's ruling that plaintiff is in the unclassified service is determinative of the issue of whether plaintiff had a property interest in her employment and whether she was entitled to due process in connection with the termination of her employment. *See Suso*, 639 N.E.2d at 121.  Accordingly, plaintiff is barred under the doctrine of issue preclusion from relitigating her claim that she had a property interest in her employment and that she could not be deprived of that interest without procedural due process protections.[9]  Summary judgment should be granted in favor of defendants on plaintiff's due process claim under § 1983.[10]

## VIII. State law claim for libel

Defendants move for summary judgment on plaintiff's claim that defendant Helfrich, "acting negligently" and "in reckless disregard of the truth," published false statements about plaintiff that "significantly harmed Plaintiff and her reputation." (Doc. 97 at 55-58; *see* Doc. 2,

---

[9] In her opposing memorandum, plaintiff alleges a "liberty interest" under § 1983 (Doc. 106 at 12), but she has neither identified a liberty interest of which she was deprived nor developed an argument related to any such interest.

[10] Because plaintiff's § 1983 claim is barred by the doctrine of issue preclusion, it is not necessary to address whether the individual defendants are entitled to qualified immunity from liability on this claim.  (Doc. 97 at 54-55).

¶¶ 46, 47, Sixth Cause of Action for Libel).[11]  Defendant Helfrich notes that plaintiff has

identified several purportedly false statements made by Helfrich which were published during

plaintiff's employment and which allegedly harmed plaintiff's reputation.  (Doc. 97 at 55, citing

Doc. 85, Pltf. Depo. at 323).  Defendant Helfrich contends that all but one statement - her

affidavit attached to HCPD's motion to dismiss filed with the SPBR on December 9, 2011 -  are

barred by the one-year statute of limitations set forth in Ohio Rev. Code § 2305.11.  (*Id.* at 56,

citing Doc. 97-1, Att. 2, Bailey Aff., Exh. A, Exh. 1).  Defendant Helfrich alleges as to that

statement, she is entitled to both an absolute and qualified privilege from liability.

Plaintiff's response to defendants' motion for summary judgment on her libel claim is

difficult to decipher.  (Doc. 106 at 13-17).  Plaintiff appears to allege that defendant Helfrich's

sworn affidavit submitted to the SPBR includes a number of false statements regarding

plaintiff's job duties and the amount of discretion she exercised, as well as other matters.  (Doc.

106 at 13-15).  Plaintiff identifies those statements and challenges them as follows:

- Plaintiff was employed by the HCPD as an "assistant public defender (assigned to be an Attorney Guardian ad Litem)[.]"  (Helfrich Aff., ¶ 4).

  Plaintiff alleges this statement is false because she was never identified as an Assistant Public Defender prior to the action before the SPBR, and instead defendants concede her job title was Attorney Guardian ad Litem throughout her employment with HCPD.  (Doc. 106 at 13-14).

- "Attorney Guardians ad Litem have firsthand knowledge of the players involved in their cases, and are therefore in the best position to make decisions; they are therefore given complete discretion regarding those cases."  (Helfrich Aff., ¶ 14).

---

[11] The Court chooses to exercise supplemental jurisdiction over plaintiff's state law claims in view of the age of this case, which has been pending for nearly three years. *See* 28 U.S.C. § 1367.  The Court is bound to apply Ohio law to plaintiff's state law claims. *See Chandler*, 283 F.3d at 823.  The Court must apply the law as announced by the Ohio Supreme Court and, where the Ohio Supreme Court has not spoken, to discern from all available sources how that Court would rule if confronted with the issue. *Miles v. Kohli & Kaliher Assocs., Ltd.*, 917 F.2d 235, 241 (6th Cir. 1990) (citations omitted).

Plaintiff alleges this statement is false because she was terminated for filing a Motion *Instanter* on a brief in a situation "where Defendant thought Plaintiff would have filed a motion for a continuance." (Doc. 106 at 14).

- In certain cases, the assistant prosecuting attorney and attorney for the accused cannot reach a plea agreement without the agreement of the Attorney Guardian ad Litem.  Plaintiff "made these decisions regarding whether or not to accept a plea agreement without input from a supervisor; she had unfettered authority to make plea deals, and did so on a daily basis. (Helfrich Aff., ¶¶ 17, 18).

  Plaintiff alleges that she did not make plea agreements, and it was impossible that she would make plea deals "on a daily basis" since she had approximately two docket days a month and did not engage in plea discussions. (Doc. 106 at 14).

- There was no oversight as to when plaintiff arrived or left in the workday. (¶ 21).

  Plaintiff does not attempt to refute this statement.

- Plaintiff "did not need permission to contact county officials, and it was fully expected she would handle these duties on her own." (Helfrich Aff., ¶ 23).

  Plaintiff alleges that when she "attempted to contact the Auditor's Office, she was asked to refrain from engaging in such conduct. Also, Defendant admits that after repeated attempts of a Magistrate with the Juvenile Court attempted [sic] to contact Plaintiff, 'she counseled Plaintiff to not engage in ex parte communications.'" (Doc. 106 at 14).

- Plaintiff "did not need permission to attend legal-education seminars, and in fact her supervisor was not involved in the process in any way, as payment was cleared through the financial administrative staff." (Helfrich Aff., ¶ 24).

  Plaintiff alleges that she "was initially denied a trip to an ABA conference where she would attend legal-education seminars by Helfrich. [She] requested to attend Rocky Mountain . . . [Defendant] Helfrich denied that.  Plaintiff was told not to contact (IRA MECKLENBERG) for legal-education." (Doc. 106 at 14).

Plaintiff alleges that the ALJ in the SPBR proceedings relied on these statements included in Helfrich's affidavit submitted to the SPBR. (*Id*. at 15, citing Doc. 97-1, Att. 2, Bailey Aff., Exh. B).  Plaintiff indicates she has been harmed by the statements because the SPBR maintains its decisions online and a prospective employer could possibly decline to select her as an employee if it viewed the decision.  Plaintiff also argues that the authority defendants

cite for the proposition that Helfrich is entitled to the defense of absolute immunity does not support their position. (*Id.* at 16).

Under Ohio law, "libel" consists of "a false written publication, made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1289-90 (Ohio 1995) (citations omitted). An action for libel must be brought within one year "after the cause of action accrued." Ohio Rev. Code § 2305.11. The statute of limitations begins to run at the time the words are written or spoken. *Lyons v. Farmers Ins. Group of Companies,* 587 N.E.2d 362, 363-64 (Ohio App. 3rd Dist. 1990).

Plaintiff filed the original complaint in this action on July 2, 2012. (Doc. 1). Therefore, she cannot bring a cause of action for libel based on any statements made before July 2, 2011, which is one year before the date the original complaint was filed. Helfrich's affidavit is dated December 8, 2011, which is within the one-year time frame. Therefore, a libel action based on statements included in the affidavit is not time-barred. Because plaintiff's employment ended on April 13, 2011, more than one year before plaintiff filed the complaint, plaintiff is barred from pursuing a libel claim based on any statements made during her employment. In any event, plaintiff has failed to address any such statements in her opposing memorandum.

As to the statements in Helfrich's affidavit that are not time-barred, Helfrich contends she is entitled to an absolute privilege. Communications made in the context of quasi-judicial proceedings are subject to an absolute privilege. *Daniels v. New Prime, Inc.*, No. 1:13-cv-402, 2013 WL 4776544, at *2 (S.D. Ohio Sept. 6, 2013) (Report and Recommendation) (Bowman, M.J.), *adopted,* No. 1:13cv402, 2013 WL 5470162 (S.D. Ohio Sept. 29, 2013), *appeal dismissed*

(Aug. 15, 2014) (citing *Baldwin v. adidas America, Inc.,* No. C2-02-265, 2002 WL 2012562 (S.D. Ohio, July 29, 2002) (noting that Ohio accords an absolute privilege to communications made during quasi-judicial proceedings, including but not limited to unemployment proceedings) (citing *Barilla v. Patella,* 760 N.E.2d 898, 906 (Ohio App. 8th Dist. 2001) ("Communications made during unemployment proceedings, which are quasi-judicial in nature, are subject to an absolute privilege."); *Saini v. Cleveland Pneumatic Co.,* No. 51913, 1987 WL 11098 (Ohio App. 8th Dist. May 14, 1987)).  *See also Stiles v. Chrysler Motors Corp.,* 624 N.E.2d 238 (Ohio App. 6th Dist. 1993) (statements made in the course of a grievance proceeding arising out of a collective bargaining agreement would be entitled to an absolute privilege under Ohio law because grievance proceedings are quasi-judicial in nature).  To be entitled to the absolute privilege, the statement must bear "some reasonable relation" to the matters at hand.  *Prakash v. Altadis U.S.A. Inc.,* No. 5:10cv0033, 2012 WL 1109918, at *11 (N.D. Ohio Mar. 30, 2012) (citing *Surace v. Wuliger,* 495 N.E.2d 939 (Ohio 1986) (holding that statements presented in a written pleading in a judicial proceeding are absolutely privileged)).  The doctrine of absolute privilege extends to communications that occur at "every step in the proceeding, from beginning to end."  *Id.* (citing *M.J. DiCorpo, Inc. v. Sweeney,* 634 N.E.2d 203 (Ohio 1994) (discussing privilege in context of judicial proceeding) (citation omitted)).  *See also Morrison v. Gugle,* 755 N.E.2d 404, 416 (Ohio App. 10th Dist. 2001) (A statement made "in a written pleading or brief, or in an oral statement to a judge or jury in open court, is absolutely privileged if it has some reasonable relation to the judicial proceeding in which it appears.") (citing *Michaels v. Berliner,* 694 N.E.2d 519, 522 (Ohio App. 10th Dist. 1997)).  Whether the absolute privilege applies in a given case is a question of law for the Court.  *Prakash,* No. 5:10cv0033, 2012 WL 1109918, at *11 (citing *Surace,* 495 N.E.2d 939; *Theiss v. Scherer,* 396 F.2d 646, 650 (6th Cir. 1968)

(whether letter was privileged was question of law for court where contents of letter and circumstances surrounding its publication were not in dispute)).

The defendant in a libel action may also invoke the defense of qualified privilege. *A & B-Abell Elevator Co.*, 651 N.E.2d at 1290. "A publication is privileged when it is 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.'" *Stein v. McGowan*, No. 1:12-cv-605, 2015 WL 268962, at *7 (S.D. Ohio Jan. 21, 2015) (citing *Taylor Bldg. Corp. of Am. v. Benfield,* 507 F. Supp.2d 832, 841 (S.D. Ohio 2007) (quoting *Hahn v. Kotten,* 331 N.E.2d 713, 718 (Ohio 1975)). Qualified privilege "merely rebuts the inference of malice that is imputed in the absence of privilege, and makes a showing of falsity and actual malice essential to the right of recovery." *Id*. (quoting *Hahn,* 331 N.E.2d at 718).

The essential elements of a qualifiedly privileged communication are: "(1) good faith; (2) an interest to be upheld; (3) a statement limited in its scope to this purpose; (4) a proper occasion; and (5) publication in a proper manner to proper parties only." *Id.* (citing *Hahn,* 331 N.E.2d at 719) (quoting *West v. Peoples Banking & Trust Co.,* 236 N.E.2d 679 (Ohio App. 4th Dist. 1967)). When the statements involved are workplace communications, Ohio courts generally require the defendant to show that she had a legitimate purpose for making the statement to the individuals involved. *Id.* (citing *Hanley v. Riverside Methodist Hosp.,* 603 N.E.2d 1126, 1131 (Ohio App. 10th Dist. 1991) (court held that documents stating the reason for the plaintiff's termination were privileged as they were created in the scope of employment and were distributed only to those managerial employees who had a need to know the information in the documents)).

Here, the Court finds as a matter of law that Helfrich enjoys an absolute privilege from liability for the statements included in the affidavit she submitted to the SPBR.  Although the parties have not cited, and the Court's research has not disclosed, a case directly on point, the Court is convinced that Ohio courts would find the SPBR proceedings to be quasi-judicial in nature if confronted with the issue.  In those proceedings, the parties briefed the motion to dismiss, the Administrative Law Judge issued a decision based on the parties' filings and the evidence of record, and the SPBR's order adopting the ALJ's decision was appealable to the Hamilton County Court of Common Pleas.  (Doc. 97-1, Att. 2, Bailey Aff., Exhs. B, C). Helfrich's affidavit statements had a direct relationship to the SPBR proceedings.  Plaintiff is therefore precluded from bringing a libel action based on the statements in Helfrich's affidavit which she challenges as libelous.

Assuming, *arguendo*, Helfrich were not entitled to an absolute privilege from a libel action, she would nonetheless be entitled to a qualified privilege.  Helfrich made the statements in her capacity as Director of the Guardian ad Litem Division in the Law Office of the HCPD. (Doc. 97-1, Att. 2, Bailey Aff., Exh. A., Exh. 1, ¶ 1).  She had a legitimate reason for making the challenged statements, which was to spell out plaintiff's job duties for the SPBR in defense of the HCPD's termination decision.  There is no evidence that Helfrich acted in bad faith by making the statements.  At most, plaintiff disputes some of the statements in her memorandum in opposition to defendants' motion for summary judgment, but she has not cited any evidence of record to support a finding that the statements were inaccurate.  (Doc. 106 at 14-15). Accordingly, Helfrich enjoys a qualified privilege from liability for libel as to the statements.

Finally, assuming, *arguendo*, that Helfrich were not entitled to either an absolute or qualified privilege as to her affidavit statements, plaintiff has not produced sufficient evidence to

create a genuine issue of material fact on the merits of her libel claim. Plaintiff has not explained how the statements in Helfrich's affidavit submitted to the SPBR "reflected injuriously on [plaintiff's] reputation," exposed plaintiff "to public hatred, contempt, ridicule, shame or disgrace," or adversely affected plaintiff in her profession. *A & B-Abell Elevator Co.*, 651 N.E.2d at 1289-90. In fact, plaintiff appears to allege that it is the publication of the SPBR decision itself that caused her injury by potentially damaging her future employment prospects. (Doc. 106 at 15). Because plaintiff has not produced evidence to show that Helfrich published libelous statements that caused injury, she cannot prevail on the merits of her libel claim.

For these reasons, summary judgment should be granted in favor of defendant Helfrich on plaintiff's libel claim.

## IX. Negligent and intentional infliction of emotional distress/negligent retention and supervision

Defendants move for summary judgment on plaintiff's claims for negligent and intentional infliction of emotional distress and negligent retention and supervision. (Doc. 97 at 58-62; *see* Doc. 2, ¶¶ 48-52). In response, plaintiff moves to dismiss her claim for negligent infliction of emotional distress pursuant to Fed. R. Civ. P. 41(a)(1) (stating "the plaintiff may dismiss an action without a court order by filing: (i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or (ii) a stipulation of dismissal signed by all parties who have appeared."). (Doc. 106 at 16). Plaintiff does not address her remaining two claims.

Dismissal of plaintiff's claim for negligent infliction of emotional distress at this stage of the litigation is not authorized under Fed. R. Civ. P. 41(a)(1). Plaintiff did not file either a notice of dismissal before defendants filed the motion for summary judgment or a stipulation of dismissal signed by all parties who have appeared in this action. Fed. R. Civ. P.

41(a)(1)(A)(i)(ii). However, the Court should nonetheless dismiss plaintiff's claim with prejudice pursuant to Fed. R. Civ. P. 41(a)(2). Defendants have fully briefed the issue of whether they are entitled to summary judgment on plaintiff's negligent infliction of emotional distress claim. Plaintiff waited until after defendants moved for summary judgment on this claim to request dismissal of the claim. Plaintiff has had ample time to muster evidence in support of this claim given the length of time this case has been pending before the Court. Dismissal without prejudice would be patently unfair to defendants. Accordingly, the dismissal of plaintiff's negligent infliction of emotional distress claim should be with prejudice. Summary judgment should be granted on plaintiff's remaining claims for intentional infliction of emotional distress and negligent retention and supervision. Plaintiff has not addressed these claims in her opposition to defendants' motion for summary judgment. Because plaintiff failed to present "even mere arguments in support of these" claims, summary judgment should be granted in defendants' favor on the claims. *Overstreet*, 115 F. App'x at 812.

## IT IS THEREFORE RECOMMENDED THAT:

Defendants' motion for summary judgment (Doc. 55) be **GRANTED** and judgment be entered in favor of defendants on all claims.

Date: 6/24/15

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

SHONITA M. BLACK,
    Plaintiff,

    vs.

HAMILTON COUNTY PUBLIC,
DEFENDER COMMISSIONER, et al.,
    Defendants.

Case No. 1:12-cv-503
Dlott, J.
Litkovitz, M.J.

**REPORT AND**
**RECOMMENDATION**

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).